UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JORDAN ZUCKERMAN, an individual,<br>Plaintiff,<br>v.<br>CHARTER COMMUNICATIONS, LLC, a limited liability company; and DOES 1 through 100, inclusive,<br>Defendant. | Case No.: 24-cv-128-WQH-BJW<br>**ORDER** |

HAYES, Judge:

The matter before the Court is the Motion for Summary Judgment (ECF No. 37) filed by Defendant Charter Communications, LLC.

**I. BACKGROUND**

On November 15, 2023, Plaintiff Jordan Zuckerman initiated this action by filing a Complaint in the Superior Court of California, County of San Diego (Case No. 37-2923-00049810-CU-OE-CTL) against Defendant Charter Communications, LLC ("Charter") and Does 1 through 100. (ECF No. 1-2.) Plaintiff asserts five claims under the California Fair Employment and Housing Act ("FEHA"): (1) disability discrimination, (2) retaliation, (3) failure to provide reasonable accommodations, (4) failure to engage in a good-faith interactive process, and (5) failure to prevent discrimination and retaliation. *Id.* ¶¶ 41–86.

Plaintiff also brings claims for wrongful constructive termination in violation of public policy and declaratory judgment. *Id.* ¶¶ 87–103.

On January 18, 2024, Charter filed an Answer. (ECF No. 1-3.)

On January 19, 2024, Charter removed the action to this Court. (ECF No. 1.) The same day, Charter refiled its Answer. (ECF No. 3.)

On March 4, 2024, Charter filed a Motion to Compel Arbitration (and Dismiss, or Alternatively, Stay Case) ("Motion to Compel Arbitration"). (ECF No. 10.) On November 22, 2024, the Court issued an Order denying the Motion to Compel Arbitration. (ECF No. 18.)

On April 2, 2026, Charter filed the pending Motion for Summary Judgment. (ECF No. 37.) On May 5, 2026, Plaintiff filed a Response in Opposition. (ECF No. 38.) On May 11, 2026, Charter filed a Reply. (ECF No. 39.)

On July 29, 2026, the Court heard Oral Argument on the Motion for Summary Judgment. (ECF No. 46.)

## II. FACTS[1]

This case concerns an employee's request to continue working from home after his employer scaled back its COVID-19 work-from-home ("WFH") policy and ordered him to return to the office.

Plaintiff is an individual who suffers from depression, anxiety, asthma, and sleep apnea. (ECF No. 37-3 at 83.) He asserts that these symptoms and his weight render him

---

[1] In his Opposition, Plaintiff does not provide specific citations to the record. Instead, he cites to "DMF 1," which the Court assumes refers to Plaintiff's Statement of Genuine Disputes of Material Fact ("DMF") (ECF No. 38-1). In the DMF, Plaintiff's response to Charter's first asserted fact spans 19 pages and contains citations to numerous parts of the record. (DMF at 2–21.) Federal Rule of Civil Procedure 56(c) requires a party asserting that a fact is genuinely disputed to "support the assertion by . . . citing to *particular parts* of materials in the record" and states that courts "need consider only the cited materials." Fed. R. Civ. P. 56(c)(1), (3) (emphasis added). The Court cautions Plaintiff that it "is not [a court's] task . . . to scour the record in search of a genuine issue of triable fact. [Courts] rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quotations and citations omitted).

"high risk" for COVID-19 complications. *Id.* He also claims that his asthma and anxiety make it hard for him to wear a face mask for long stretches of time. (ECF No. 38-3 ("Plaintiff Decl.") ¶ 11.) Charter is Plaintiff's former employer. (Compl., ECF No. 1-2 ¶ 3.) Plaintiff began working for Charter's predecessor in October 2015. (ECF No. 39-2 ¶ 6.)

**A. Plaintiff's Job Duties**

Plaintiff became a "Community Solutions Representative" ("CSR") at Charter in 2019. *Id.* CSRs perform customer service and sales duties in a call center. (ECF No. 37-5 ("Jones Decl.") ¶ 3.) Charter requires its CSRs to "provide excellent customer service, engage customers with professionalism, and meet Charter's performance expectations regarding certain call handling metrics." *Id.* These performance metrics include sales goals, "Voice of the Customer" ("VOC") ratings, efficient troubleshooting, and average call handling time. *Id.* VOC ratings derive from anonymous customer satisfaction surveys completed at the end of calls. (ECF No. 37-3, Ex. A ("Plaintiff Dep.") at 110:24–111:23.)

**B. Plaintiff's Pre-WFH Performance**

During his more than six years working for Charter, Plaintiff received raises and his hourly wage doubled. (Plaintiff Decl. ¶ 3.) Before March 2020, Plaintiff received three corrective actions: one notification of failure to meet certain metrics in 2017 (ECF No. 37-4 at 11–13) and two written warnings for "violation of Charter Communications Code of Conduct," *id.* at 15–20; ECF No. 37-3 at 124–26. In 2018, Plaintiff received an "Achieved Expected Performance" rating and a 3 out of 5 score on his annual performance review. (ECF No. 37-4 at 23.) His manager wrote, "[y]ou are amazing at your job and although we had a few opportunities along the way, you always put into action our coaching goals. [Y]ou are a great team member . . . ." *Id.* at 24. Plaintiff again received a 3 out of 5 score in his 2019 and 2020 performance reviews. (ECF No. 37-3 at 121, 128.) His managers stated that he had "met expectations," demonstrated "hard work and dedication," and had "impeccable attendance," but that he "need[ed] to work on some key areas." *Id.*

/ / /

/ / /

**C. Charter's COVID-19 WFH Policy**

When the COVID-19 pandemic began in March 2020, Charter allowed employees who considered themselves "high risk" for severe COVID-19 complications to apply to WFH instead of working from the call center. (Plaintiff Dep. at 148:15–149:14; ECF No. 37-3, Ex. D ("Jones Dep.") at 34:06–11.) Plaintiff filled out a form stating that he believed his "health was in danger by staying in the call center" and Charter temporarily granted him the ability to WFH. (Plaintiff Dep. at 148:18–24.) Only some Charter call center employees were permitted to WFH during the initial stages of the pandemic. *Id.* at 148:25–149:02.

Plaintiff signed a "COVID-19 Temporary Remote Working Acknowledgment for Employees" on March 27, 2020. (ECF No. 37-4 at 27–28 ("WFH Agreement").) The WFH Agreement provided, in relevant part, that:

> Charter may allow employees to work remotely on a temporary basis if it determines that working remotely is appropriate and the employee can do so productively. Remote working under the extraordinary circumstances of the COVID-19 situation does not mean that remote working will be feasible or appropriate under other circumstances . . . Charter will regularly review the appropriateness of an employee remote working and may end the remote working arrangement at any time in its discretion.

*Id.* at 27.

**D. Plaintiff's WFH Performance**

On May 28, 2021, while WFH, Plaintiff received a "Final Written Warning" for "failure to exhibit professional workplace behavior," due to using a "confrontational and argumentative" tone with a customer. (ECF No. 37-3 at 136.)

In his 2021 performance review, Plaintiff received a "Partially Achieved Expected Performance" rating and a 2 out of 5 score. (ECF No. 37-3 at 132.) His manager stated that he was "dependable" and "self-sufficient," writing, "you have the potential to be a great agent, however . . . you come off not so great to some of our customers, which is seen with your VOC overall for the year." *Id.* at 133. His manager further stated: "Once you have mastered [raising your VOC] you will be able to become a Rep 3 and potentially a Lead to

help progress your career with Spectrum. I look forward to . . . celebrating your anticipated success!" *Id.*

In early 2022, Plaintiff received a verbal warning for exhibiting a "pattern of behavior" of being "very rude[] and argumentative" with customers." *Id.* at 140. On February 17, 2022, Plaintiff received coaching to improve his mobile pitch skills. *Id.* at 141. His manager wrote:

> you have shown great improvement overall for your VOC[;] we still haven't hit goal but you are very close . . . Currently you are in the bottom 15% for your VOC/Overall Corporal Ranking . . . you are in your grace period however this is your last month and must show improvement on all these numbers to avoid an[y] further actions.

*Id.*

In March 2022, Plaintiff's average overall ranking fell to the bottom 11%. (ECF No. 39-2 ¶ 27.) On March 10, 2022, Plaintiff received a Final Verbal Warning, informing him that "continued poor performance . . . may result in further corrective action up to and including termination of your employment." (ECF No. 37-3 at 370.)

On March 17, 2022, Plaintiff was placed on a Performance Improvement Plan ("PIP") for "continued low performance." (ECF No. 37-3 at 369–75.) Plaintiff's average VOC rating was "well below standard minimums." (ECF No. 37-3, Ex. E ("Allen Dep.") at 77:01–09.) The PIP, which Plaintiff signed, notified Plaintiff: "In cycle 2 your performance ranked in the bottom 15% of all employees in SCS with an average of 1.96%. As a result, your overall stacked rank performance has been in the unacceptable range for a 3 cycle average of 10.99%." (ECF No. 37-3 at 370.) The PIP further stated that "failure to demonstrate immediate and sustained improvement may result in further disciplinary action up to and including dismissal." *Id.* at 375.

**E. Charter's Return to Office Policy**

In March 2022, Charter loosened its in-office COVID-19 guidelines, eliminating mask and social distancing requirements under most circumstances. (ECF No. 38-2 at 204.) In April 2022, Charter began requiring San Diego call center employees to return to the office. (Jones Decl. ¶ 4.) Charter called back employees in phases based on performance,

with the lowest performers required to return to the office first. (Allen Dep. at 32:15–33:13; ECF No. 37-3, Ex. C ("Zabayle Dep.") at 147:19–24, 148:06–12.)

Manager Maria Jones testified that she attended a meeting in which human resources ("HR") decisionmakers told her that employees would return to the office "starting with the lower performers, and then eventually the other performers, could be top performers, and then the high risk agents at that time." (ECF No. 38-2, Ex. 4 ("Jones Dep. II") at 77:16–78:04.) Jones stated that "anyone that had heart conditions, something like that" was considered "high risk," and that HR "would have been involved" in determining who qualified as "high risk." *Id.* at 78:10–11, 79:01–05; *see also id.* at 79:07–14. Jones further agreed that she was "told that the lowest performers who were considered high risk could remain working from home." *Id.* at 127:18–21. However, she later gave the following testimony about the employees Charter eventually allowed to WFH:

> Q: Were any of the employees that you supervised that Charter deemed to be high risk given the accommodation by Charter to continue to work from home? . . .
>
> A: Yes, if they were top performers.
>
> Q: Were they given the accommodation of continuing to work from home due to them being high risk or were they just allowed to work from home because they were top performers?
>
> A: Just for top performing.

*Id.* at 104:11–23.

Charter classified employees who had "write-ups" or "fell into the bottom 15% overall stack ranking" as poor performers. (Allen Dep. at 48:01–19.) Plaintiff's direct supervisor, Xavier Allen, testified that everyone he supervised who was in the bottom 15% or who had a current write-up was told to return to the office in the first phase. *Id.* at 50:22–51:25.

/ / /

/ / /

**F. Plaintiff's Requests to WFH**

Plaintiff took precautions to avoid COVID-19, limiting his outings outside of the home even after government restrictions loosened and wearing an N-95 mask each time he stepped outside. (ECF No. 37-3 at 83–84.) Plaintiff became increasingly anxious about the virus when his coworker passed away from COVID-19 complications. *Id.* at 83. Plaintiff's panic attacks became so pervasive that he and his wife saw a marriage counselor to better manage Plaintiff's anxiety together. *Id.*

On April 4, 2022, Plaintiff's direct supervisor, Allen, called Plaintiff to tell him he needed to return to the office on May 6, 2022—in the first phase of workers called back to the office. (Plaintiff Dep. at 167:19–168:09.) Plaintiff told Allen that he did not feel safe returning to the office because he was at "high risk" for COVID-19 complications. (Allen Dep. at 56:02–16.) Allen told his manager, Jones, about Plaintiff's request to continue WFH. *Id.* at 58:11–24, 35:08–13. Specifically, Jones testified that she and Allen had the following conversation: Allen told Jones that Plaintiff "could not return to work in person because he could not wear a mask . . . because of his disabilities." (Jones Dep. II at 63:21–64:04.) Jones replied that Plaintiff could still perform social distancing in the office. *Id.* at 64:05–10. Jones testified that, by "social distancing," she meant that Charter could put him in an area "away from the majority of the agents," but maybe still "next to one agent," and still "in the same room [as] about 75 to 100" other employees. *Id.* at 64:05–24, 66:25–67:14.

On April 11, 2022, Plaintiff began applying for other jobs that would allow him to WFH. (Plaintiff Dep. at 234:14–23.)

On April 18, 2022, Allen told Plaintiff that Charter would not permit him to WFH and that he still needed to return to the office on May 6, 2022. (Plaintiff Decl. ¶ 21.) The same day, Plaintiff emailed HR employee Robert Zabayle, stating:

> I am writing to request a reasonable accommodation for my medical disability . . . to continue to work from home during the COVID-19 pandemic . . . Because of my disability, I am in a higher risk group for contracting and/or experiencing severe or even fatal symptoms from COVID-19. For this reason,

I must limit contact with others during this pandemic as much as possible.

*Id.* ¶ 22.

Zabayle informed HR manager Deborah Zaharychuk that Plaintiff requested to WFH "based on his medical condition." (Zabayle Dep. at 21:16–20, 51:19–52:07.) Zaharychuk told Zabayle that she and HR director Denis Nazarenkov reviewed Plaintiff's request and decided not to approve it. *Id.* at 52:22–53:06; *see also id.* at 25:16–21.

Later that day, Zabayle emailed Plaintiff the following, in relevant part:

> While our Work From Home program was only temporary, we are working on bringing all employees back in the office. Based on your email I understand that you are requesting an accommodation for medical reasons . . . you are certainly eligible to start a claim for medical and disability accommodations through the proper channels, in your case that would be through FMLA/ADA (Sedgwick). If you have been contacted by your supervisor and have been given a date to return to the office, that date stands.

(ECF No. 38-2 at 320.)

On April 19, 2022, Plaintiff contacted Sedgwick, Charter's third-party leave administrator, which told him that he "needed a referral from [Charter] to move forward." (Plaintiff Decl. ¶ 24.)

The same day, Plaintiff emailed Zabayle the following: "I reached out to Sedgwick and they informed me that they need to receive a referral from [Charter] before starting my claim . . . I was given a date of May 6th to return to the office. I would like to request an extension to allow time for this Accommodation request process." (ECF No. 38-2 at 323.) Zabayle replied: "[T]he date to return to the office will stand. However, you can still continue with the Sedgwick process. If a leave of absence is requested as part of your Sedgwick claim and it's approved, Sedgwick will communicate that to you . . . ." *Id.* at 322.

Plaintiff wrote Zabayle,

> Sedgwick informed me that they need a referral from [Charter] to begin the Accommodation claim. Please advise who I need to speak with to initiate this urgent request. As you know, I am working within a short time frame. I am not requesting a leave of absence. I am requesting a Reasonable

> Accommodation to continue to work from home . . . I understand the return to office date is May 6th however I was not anticipating any delays in beginning the claim process. Please also advise who I can speak with regarding amending the return to office date.

*Id.* at 324.

Zabayle replied, "I'm not sure why Sedgwick is asking for a referral from Charter . . . I would suggest to reach back out to Sedgwick for clarification. As far as amending your return to the office date, you can speak to your supervisor and manager." *Id.* at 323.

On April 20, 2022, Plaintiff again called Sedgwick to request a WFH accommodation. (Plaintiff Decl. ¶ 29.) Sedgwick told Plaintiff that he needed to fill out [Family and Medical Leave Act ("FMLA")] paperwork and that he could not proceed with his WFH accommodation request until his FMLA leave request was denied. *Id.*

On April 25, 2022, Plaintiff emailed Jones, stating:

> I do have a medical disability under the ADA which places me in a higher risk group for contracting and/or experiencing severe or even fatal symptoms from Covid-19. I have requested a Reasonable Accommodation to continue to work from home due to these disabilities. Unfortunately, the process is taking longer than expected and I ask that my return to office date of May 6, 2022 be extended while I work with Sedgwick on the Accommodation process. Robert Zabayle in HR advised me to seek your approval regarding this request.

(ECF No. 37-3 at 327.)

Jones reached out to Zabayle from HR to discuss Plaintiff's email. (Jones Dep. at 46:24–47:12.) Jones and Zabayle agreed that Plaintiff "would need to return back to the office [] because of his . . . poor performance." (Jones Dep. II at 48:01–23.) Zabayle told Jones that HR had not designated Plaintiff as "high risk" at that point, but he "didn't go into detail." *Id.* at 95:11–13, 96:02–05, 97:05–22, 98:10–14. Jones and Zabayle concluded that, based on Plaintiff's performance, "it was not possible" for him to WFH, and that he could perform "social distancing" and wear a mask" (Jones Dep. at 96:02–12, 130:04–10.)

On April 26, 2022, Plaintiff received the FMLA paperwork from Sedgwick. (ECF No. 37-3 at 86.) Plaintiff called Sedgwick for clarification because the paperwork did not mention accommodations. *Id.* Sedgwick told Plaintiff that it only handled requests for

leave, not accommodations. *Id.*

On April 27, 2022, Plaintiff had a call with Jones and Allen, in which they told Plaintiff that Charter was ending the WFH program and Plaintiff would need to return to the office. *Id.* Plaintiff told Jones and Allen that he "ha[d] disabilities under the ADA." (Plaintiff Decl. ¶ 32.) Jones and Allen denied Plaintiff's request to extend the return-to-office date while he continued to insist on WFH. (ECF No. 37-3 at 86.) They told Plaintiff that Charter would fire him if he did not return to the office on May 6, 2022. *Id.*

On April 28, 2022, Plaintiff's wife contacted Charter's Employee Solutions Team ("EST") to again ask if he could continue to WFH. (Plaintiff Dep. at 195:02–10; ECF No. 38-4 ("Sklover Decl.") ¶ 3.) EST directed Plaintiff's request back to his local HR team. *Id.* Zabayle emailed Plaintiff, stating that EST had referred Plaintiff's request to him. (ECF No. 38-2 at 326.) Plaintiff replied, stating:

> After speaking with many different people both at Sedgwick and [Charter], it is everyone's understanding a Reasonable Accommodation Request under the ADA is processed by my local Human Resources department. Please advise how to begin the Reasonable Accommodation claim and what the exact process is. Again, I am not requesting a Leave of Absence or FMLA therefore, Sedgwick should not be involved.

*Id.*

In response, Zabayle called Plaintiff on April 28, 2022 and took the following notes after their conversation:

> I advised [Plaintiff] that our work from home program has ended and that if he received a call from his leadership with a return to the office date, he [is] to comply. He then said that it is hard for him to believe that a company this large is not able to grant his request to keep working from home due to his medical condition. I informed him that if he needs accommodation due to his medical condition to reach out to Sedgwick . . . He stated that he is not requesting a leave of absence therefore Sedgwick should not be involved. He said th[at] he is requesting to continue to work from home. I reminded him again that we no longer have that program.

*Id.* at 327.

At the time he made these requests to WFH, Plaintiff had not submitted any medical

documentation from a health care professional ("HCP"), nor did Charter ask him for such documentation. (Plaintiff Decl. ¶ 49; *see also* Jones Dep. II at 97:24–98:05; ECF No. 38-2, Ex. 5 ("Zabayle Dep. II") at 125:04–24.) Plaintiff never requested any accommodation other than WFH. (Plaintiff Dep. at 87:10–17.) Zabayle testified that Charter did not suggest any other accommodation. (Zabayle Dep. II at 131:12–21.)

On May 4, 2022, a Sedgwick employee sent Allen and Zabayle an email with Plaintiff's name in the subject line, stating: "We are unable to process the job accommodation claim for the Employee above as he did not have a co covered by Sedgwick prior to the request for restricted return to work. Therefore the claim will be close[d;] accommodation of working from home would need to be addressed internally."[2] (ECF No. 38-2 at 330.)

**G. Plaintiff's Leave of Absence and Medical Documentation**

On May 4, 2022, Plaintiff requested a leave of absence and short-term disability benefits. (ECF No. 39-2 ¶ 61.) Charter granted Plaintiff's request. (ECF No. 37-3 at 185.)

In support of his request for leave, Plaintiff provided medical documentation from his psychiatrist. (ECF No. 39-2 ¶ 63.) On May 11, 2022, Plaintiff's psychiatrist wrote that Plaintiff complained that being "scared to return to work with shared work spaces during [the] pandemic" was "worsening [his] anxiety and asthma, causing panic attacks." (ECF No. 37-3 at 157.) The psychiatrist further stated that Plaintiff was "worried about exposure [to COVID-19] at work due to the death of a coworker . . . and wearing a mask worsening his asthma." *Id.*

Plaintiff's wife also submitted a letter from his psychiatrist dated May 24, 2022, which states that Plaintiff suffers from "anxiety, depression, and panic attacks" and has "medical conditions that affect his breathing and pulmonary function," which "cause him

[2] The screenshot submitted by the parties does not appear to contain the full text of the email. *See id.* Counsel for both parties recognized this at Zabayle's deposition but did not produce a more complete version of the email. (Zabayle Dep. II at 116:10–117:15 (counsel stating that the email "is cut off").)

to be at increased risk of serious illness or death from Covid-19." (Sklover Decl. ¶ 4, Ex. 1.) The psychiatrist further stated that wearing a mask "exacerbates [Plaintiff's] breathing difficulties which in turn trigger extreme panic attacks and anxiety." *Id.*

On June 1, 2022, Sedgwick requested additional medical documentation to support Plaintiff's request to extend his leave. (ECF No. 38-3 at 32.) Plaintiff submitted supplemental documentation from his psychiatrist indicating that he would need to remain on leave until August 14, 2022. (ECF No. 37-3 at 168.) The psychiatrist stated that Plaintiff was "unable to effectively work in the work environment" but "able to communicate with clients from the safety of his home." *Id.* The psychiatrist diagnosed Plaintiff with "major depressive disorder, moderate, persistent mood disorder, [and] anxiety disorder," and recommended that he abstain from working because of his "increased anxiety . . . , frequent panic attacks making it near impossible for [him] to leave his home, low energy, insomnia, [and] poor concentration." *Id.* At this time, Plaintiff was experiencing panic attacks at least three to five times per week. *Id.* at 170; *see also* Plaintiff Dep. at 215:25–216:05.

Plaintiff continued to apply for other jobs during his leave of absence. (ECF No. 39-2 ¶ 73.)

**H. Plaintiff's Resignation**

While still on leave, Plaintiff sent Charter his letter of resignation on July 10, 2022. (ECF No. 37-3 at 187–88.) He began working at a new, fully remote job the following day. (ECF No. 39-2 ¶¶ 75, 77.)

Plaintiff stated in November 2025 that he still believed the COVID-19 pandemic was ongoing. *Id.* ¶ 43. Plaintiff does not intend to work in an in-person office environment until the COVID-19 virus has been fully eradicated. (Plaintiff Dep. at 174:10–23.)

**I. Changes to Charter's WFH Policy**

Charter later changed its policy to offer a WFH option. (ECF No. 38-2, Ex. 1 ("Allen Dep. II") at 39:04–09.) Charter initially told all employees that they would have to return to the office but eventually allowed high performers to continue WFH. (Allen Dep. at

41:18–42:01, 49:21–24.) As of December 2025, three agents on Plaintiff's former team were still fully remote. *Id.* at 29:20–24.

## III. LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). The materiality of a fact is determined by the substantive law governing the claim or defense. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986).

The moving party has the initial burden of demonstrating that summary judgment is proper. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153 (1970). Where the party moving for summary judgment bears the burden of proof at trial, the moving party "must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992). Where the party moving for summary judgment does not bear the burden of proof at trial, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325.

If the moving party meets the initial burden, the burden shifts to the opposing party to show that summary judgment is not appropriate. *See Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 322, 324. The nonmoving party cannot defeat summary judgment by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. The nonmoving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S.

at 324. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255 (citing *Adickes*, 398 U.S. at 158–59). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* at 255. However, "[a] conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact." *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial,' and summary judgment is appropriate." *Zetwick v. County of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)).

## IV. DISCUSSION

### A. Evidentiary Objections

Plaintiff raises evidentiary objections to several documents submitted in support of Charter's Motion for Summary Judgment. The Court addresses only those objections regarding material cited in this Order. To the extent Plaintiff objects to documents not cited in this Order, the Court denies those objections as moot. The Court's evidentiary rulings are without prejudice to raise the same objections again at the motion in limine stage.

First, Plaintiff contends without further explanation that several pieces of evidence are "irrelevant." (*See, e.g.*, ECF No. 39-3 ¶¶ 10, 16, 21.) "[O]bjections for relevance are generally unnecessary on summary judgment because they are 'duplicative of the summary judgment standard itself.'" *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 665 (9th Cir. 2021) (quoting *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006)). "[I]f evidence submitted on summary judgment could create a genuine dispute of material fact, it is, by definition . . . relevant," and if it cannot, "there is no need for the court to separately determine whether it is relevant." *Id.* The Court declines to rule on Plaintiff's relevance objections because doing so is unnecessary to resolve the Motion for Summary Judgment. *Persian Gulf Inc. v. BP W. Coast Prods. LLC*, 632 F. Supp. 3d 1108, 1131 (S.D. Cal. 2022).

Second, Plaintiff objects to Charter's attachment of deposition transcripts as exhibits. (ECF No. 39-3 ¶¶ 25–29.) Plaintiff contends that the deposition transcripts are "inadmissible hearsay," "unauthenticated," lacking in foundation, and "conclusory, speculative, or conjecture." *Id.* "A deposition or an extract therefrom is authenticated in a motion for summary judgment when it identifies the names of the deponent and the action and includes the reporter's certification that the deposition is a true record of the testimony of the deponent." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764 (9th Cir. 2002) (citations omitted). The deposition transcripts submitted by Charter meet these requirements. (*See* ECF No. 37-3.) Moreover, Plaintiff has submitted portions of the same deposition transcripts, with the same certifications, in support of his Opposition to the Motion for Summary Judgment. (*See* ECF No. 38-2.) The Court overrules Plaintiff's objection to the deposition transcripts on authentication grounds.

The Court also overrules Plaintiff's objections to the deposition transcripts on all other grounds. Under Federal Rule of Civil Procedure 56(c)(2), "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Plaintiff has not identified the specific content that cannot be presented in a form that would be admissible at trial.

Third, Plaintiff objects to portions of Melissa Cogan's declaration (ECF No. 37-4 ("Cogan Decl.").) Ms. Cogan states that she has served as a Director of Human Resources at Charter since October 2024 and is "a custodian of records pertaining to the tenure, performance, activities, leave of absence dates, and requests for accommodations, and various other information regarding employees that [she] support[s] and that have been a part of Community Solutions, including [Plaintiff]." *Id.* ¶¶ 1–2. Plaintiff objects to the following statements in Ms. Cogan's declaration, as well as the exhibits she references:

> As part of my job duties in my role as a Director of HR, I have access to Mr. Zuckerman's annual performance reviews, as well as any corrective actions Mr. Zuckerman received during his tenure with TWC and Charter.
>
> True and correct copies of corrective actions Mr. Zuckerman received in 2017

> and 2018 are attached hereto as Exhibit B and Exhibit C, respectively.
>
> A true and correct copy of Mr. Zuckerman's 2018 annual performance review is attached hereto as Exhibit D.
>
> As part of my job duties in my role as a Director of HR, I also have access to Mr. Zuckerman's personnel file.
>
> Included in his personnel file is a copy of the COVID-19 Temporary Working Acknowledgment for Employees that Mr. Zuckerman signed in connection with his request to work from home during the COVID-19 pandemic. A true and correct copy of the COVID-19 Temporary Working Acknowledgment for Employees, including Mr. Zuckerman's signature page, is attached hereto as Exhibit E.

*Id.* ¶¶ 9–13.

Plaintiff contends that these statements and referenced exhibits are "conclusory," "speculative," not properly authenticated, hearsay, and lacking in foundation and personal knowledge. (ECF No. 39-3 ¶¶ 9–13.) Plaintiff contends that Ms. Cogan "was not employed with Defendant" when the events giving rise to this action occurred and thus "has no knowledge of Defendant's policies or practices from the relevant time." *Id.* He further contends that Ms. Cogan does not have personal knowledge that the referenced exhibits were made by someone with personal knowledge or kept in the course of a regularly conducted business activity. *Id.*

At the summary judgment stage, courts focus on the admissibility of the evidence's contents, not its form. *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003). "Personal knowledge may be inferred from a declarant's position." *In re Kaypro*, 218 F.3d 1070, 1075 (9th Cir. 2000) (citations omitted). Here, Ms. Cogan states that she has access to CSR personnel files in her role as an HR Director, and that those records are maintained in the ordinary course of business. (Cogan Decl. ¶¶ 1–2, 9–13.) The Court finds that the relevant documents from Plaintiff's personnel file could be presented in an admissible form at trial. *See, e.g.*, *Allision v. Dolich*, 148 F. Supp. 3d 1142, 1145 (D. Or. 2015) (overruling hearsay objections at summary judgment stage to payroll files attached to director's declaration);

*Bengtsson v. Caris MPI, Inc.*, No. 2:22-CV-02894-MEMF (JCx), 2022 WL 2764367, at *4 (C.D. Cal. July 13, 2022) (overruling hearsay and personal knowledge objections at summary judgment stage to HR officer's statements about contents of business records). Plaintiff's objections to the cited portions of Ms. Cogan's declaration are overruled.

**B. Disability Discrimination**

***1. Legal Standard***

The FEHA makes it unlawful for an employer to discriminate against an employee "because of" protected characteristics enumerated in the statute, including the employee's "physical disability, mental disability, [or] medical condition . . . ." Cal. Gov't Code § 12940(a). California courts look to federal precedent when applying state employment discrimination laws. *Guz v. Bechtel Nat'l, Inc.*, 8 P.3d 1089, 1113 (Cal. 2000). The applicable legal standard depends on whether the plaintiff presents circumstantial or direct evidence of discrimination.

In FEHA cases with circumstantial evidence of discrimination, California courts apply the *McDonnell Douglas* burden-shifting test. *Hittle v. City of Stockton*, 101 F.4th 1000, 1011–12 (9th Cir. 2024), *cert. denied*, 604 U.S. ___ (2025) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *Guz*, 8 P.3d at 1113. To establish a prima facie case of FEHA disability discrimination, a plaintiff must show that he: (1) suffers from a disability, (2) is otherwise qualified for the job, and (3) was subjected to an adverse employment action because of his disability. *Brundage v. Hahn*, 66 Cal. Rptr. 2d 830, 835 (Cal. Ct. App. 1997) (citation omitted). "While the plaintiff's prima facie burden is not onerous, he must at least show actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a prohibited discriminatory criterion." *Guz*, 8 P.3d at 1113 (quotations and citations omitted). If the plaintiff establishes a prima facie case, the burden shifts to the employer to "offer a legitimate nondiscriminatory reason for the adverse employment decision." *Id.* The burden then shifts back to the plaintiff to prove that

the "employer's proffered reason was pretextual." *Id.* (citations omitted). To win summary judgment, the employer must show "either that (1) plaintiff could not establish one of the elements of the FEHA claim or (2) there was a legitimate, nondiscriminatory reason for its decision to terminate plaintiff's employment." *Dep't of Fair Emp. & Hous. v. Lucent Techs., Inc.*, 642 F.3d 728, 745 (9th Cir. 2011) (quoting *Avila v. Cont'l Airlines, Inc.*, 82 Cal. Rptr. 3d 440, 449 (Cal. Ct. App. 2008)).

In FEHA cases with direct evidence of discrimination, the *McDonnell Douglas* test does not apply. *Trop v. Sony Pictures Ent., Inc.*, 29 Cal. Rptr. 3d 144, 152–53 (Cal. Ct. App. 2005); *see also Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) ("[T]he *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination."). Instead, the defendant in such a case "can avoid liability only by proving the plaintiff would have been subjected to the same employment decision without reference to the unlawful factor." *Morgan v. Regents of Univ. of Cal.*, 105 Cal. Rptr. 2d 652, 664 (Cal. Ct. App. 2000) (citations omitted).

### 2. *Direct or Circumstantial Evidence*

The Court assesses which legal framework applies. Plaintiff contends that the *McDonnell Douglas* test does not apply because he offers direct evidence of disability discrimination. (ECF No. 38 at 24–25.) "Direct evidence is evidence which proves [the] fact [of discriminatory animus] without inference or presumption." *Trop*, 29 Cal. Rptr. 3d at 153. In the disability discrimination context, such evidence "includes comments that demonstrate discriminatory animus and a causal relationship between those comments and the adverse employment action." *Zamora v. Security Indus. Specialists, Inc.*, 285 Cal. Rptr. 3d 809, 832–33 (Cal. Ct. App. 2021) (citing *DeJung v. Superior Ct.*, 87 Cal. Rptr. 3d 99, 111 (Cal. Ct. App. 2008)). Plaintiff fails to specify exactly what the purported direct evidence of discrimination is. (*See* ECF No. 38 at 24–25.) To the extent he argues that denial of his WFH request without sufficient discussion qualifies as direct evidence of discrimination, the Court rejects his argument. *See Zamora*, 285 Cal. Rptr. 3d at 834 (holding that denial of plaintiff's requests for modified work and failure to adequately

communicate with him was not direct evidence of discrimination). Because Plaintiff fails to identify direct evidence of discrimination, the *McDonnell Douglas* test applies.

### *3.* **McDonnell Douglas** ***Prima Facie Case of Discrimination***

Charter contends that Plaintiff fails to establish a prima facie case of discrimination because (1) he was not a qualified individual with a disability and (2) "he did not suffer an adverse employment action, much less because of any disability." (ECF No. 37-1 at 18.)

i. Adverse Employment Action

"An 'adverse employment action' is one that 'materially affects the terms, conditions, or privileges of employment.'" *Doe v. Dep't of Corr. & Rehab.*, 255 Cal. Rptr. 3d 910, 921 (Cal. Ct. App. 2019) (quoting *Yanowitz v. L'Oreal USA, Inc.*, 116 P.3d 1123, 11326 (Cal. 2005)).[3] "[T]he determination of whether a particular action or course of conduct rises to the level of actionable conduct should take into account the unique circumstances of the affected employee as well as the workplace context of the claim." *Yanowitz*, 116 P.3d at 1137. Actions "reasonably likely to adversely and materially affect an employee's job performance or opportunity for advancement" are actionable under the FEHA; "minor or relatively trivial" actions that "are reasonably likely to do no more than anger or upset an employee" are not. *Id.* at 1138–39.

Plaintiff contends that he suffered an adverse employment action because Charter denied his WFH accommodation request without sufficient consideration. (ECF No. 38 at 26–27.) This argument is unavailing because failure to engage in a good-faith interactive process and failure to provide reasonable accommodations "do not constitute 'adverse employment actions' in the context of a claim of [FEHA] discrimination." *Brown v. Los*

---

[3] The United States Supreme Court later adopted a broader standard for adverse employment actions for some claims brought under Title VII of the federal Civil Rights Act of 1964. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 60, 67–68 (2006). However, the California Supreme Court has not reconsidered *Yanowitz* in light of *Burlington* or applied *Burlington*'s standard to FEHA claims. *See Bailey v. San Francisco Dist. Att'y's Off.*, 552 P.3d 433, 450 n.8 (Cal. 2024).

*Angeles Unified Sch. Dist.*, 275 Cal. Rptr. 3d 322, 332 (Cal. Ct. App. 2021); *see also Miller v. Dep't of Corr. & Rehab.*, 325 Cal. Rptr. 3d 746, 759 (Cal. Ct. App. 2024).

Plaintiff further contends that he satisfies the "adverse employment action" prong because Charter constructively discharged him. (ECF No. 38 at 14, 26–27.) "Constructive discharge occurs when the employer's conduct effectively forces an employee to resign." *Turner v. Anheuser-Busch, Inc.*, 876 P.2d 1022, 1025 (Cal. 1994). To establish constructive discharge, a plaintiff must prove that "the employer either intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign." *Id.* at 1029. "[T]he proper focus is on the working conditions themselves, not on the plaintiff's *subjective* reaction to those conditions." *Gibson v. Aro Corp.*, 38 Cal. Rptr. 2d 882, 887 (Cal. Ct. App. 1995) (citing *Turner*, 876 P.2d at 1027). To constitute constructive discharge, "[t]he conditions giving rise to the resignation must be sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer." *Turner*, 876 P.2d at 1026. Whether conditions are "intolerable or aggravated" is generally a question of fact. *Scotch v. Art Inst. of Cal.*, 93 Cal. Rptr. 3d 338, 368 (Cal. Ct. App. 2009) (citations omitted). "[H]owever, summary judgment against an employee on a constructive discharge claim is appropriate when, under the undisputed facts, the decision to resign was unreasonable as a matter of law." *Id.* (citations omitted).

Plaintiff contends that he "had no choice to resign" because Charter "refused to accommodate Plaintiff, or even discuss accommodations with Plaintiff, and because [Charter] refused to allow Plaintiff to work safely." (ECF No. 38 at 14.) The record belies this argument because Plaintiff's decision to seek other employment occurred before Charter denied his accommodation request. The undisputed facts show that Charter first told Plaintiff he needed to come back to the office in a call on April 4, 2022. (ECF No. 38-1 ¶ 36; Plaintiff Dep. at 167:19–168:09.) On April 11, 2022, Plaintiff began applying for

other jobs. (ECF No. 38-1 ¶ 39; Plaintiff Dep. at 234:14–23.) Charter first rejected Plaintiff's WFH request on April 18, 2022. (Plaintiff Decl. ¶ 21.) When Plaintiff first sought other employment, he did not know that Charter would reject his WFH accommodation request. Merely telling Plaintiff to work in person does not rise to the level of "intolerable or aggravated" conditions that would compel a reasonable person to resign. *Turner*, 876 P.2d at 1029; *see also Allos v. Poway Unified Sch. Dist.*, 334 Cal. Rptr. 3d 425, 439–40 (Cal. Ct. App. 2025) (finding no constructive discharge where employee who felt "unsafe" due to COVID-19 retired after employer denied WFH request); *Kinney v. St. Mary's Health, Inc.*, 76 F.4th 635, 639–40, 648 (7th Cir. 2023) (requiring employee with anxiety about wearing masks to work in person during pandemic did not amount to constructive discharge).

Plaintiff submits no other evidence supporting his constructive discharge theory, other than the fact that Charter repeatedly denied his WFH requests. However, "failure to accommodate or engage [in the interactive process] cannot constitute an adverse employment action" under the FEHA. *Barnett v. Costco Wholesale Corp.*, No. 22-55550, 2023 WL 6276294, at *1 (9th Cir. Sept. 26, 2023); *see also Doe*, 255 Cal. Rptr. 3d at 923 ("No court has ever held that a failure to reasonably accommodate an employee's disability . . . can qualify as the adverse action underlying a discrimination or retaliation claim."). Otherwise, "every time an employee was denied a requested accommodation, he would be able to double dip by asserting both" failure to accommodate and discrimination or retaliation claims. *Doe*, 255 Cal. Rptr. 3d at 923 (quotations and citation omitted).

Plaintiff further contends that he was "forced to be on leave for two months prior to his resignation" because of Charter's "failure to accommodate him, failure to engage in an interactive process, and disability discrimination." (ECF No. 38 at 14.) But Charter did not force Plaintiff to take medical leave and receive short-term disability benefits; he requested it. (ECF No. 39-2 ¶ 61.) Charter's approval of Plaintiff's leave request does not constitute an adverse employment action under California law. *See Doe*, 255 Cal. Rptr. 3d at 922–23 (holding that plaintiff who requested medical leave after employer denied accommodation

did not suffer adverse action because "[n]othing in the record suggests [employer] forced him to [take leave], or refused to pay him during his leaves").

At oral argument, Plaintiff's counsel relied on two cases finding triable issues regarding constructive termination: *Colores v. Board of Trustees* and *Martinez v. Costco Wholesale Corporation*. Neither case changes the Court's conclusion.

In *Colores*, the plaintiff suffering from fibromyalgia went on disability retirement. *Colores v. Bd. of Trs.*, 130 Cal. Rptr. 2d 347, 354 (Cal. Ct. App. 2003). The California Court of Appeal found a genuine issue of fact as to whether she was constructively terminated because her coworkers took many steps to make her job unreasonably stressful, despite knowing that stress exacerbated her disability. *Id.* at 358–61. For instance, although she received positive performance reviews, her supervisors directed several people to document her for termination without cause, told other employees to fabricate a mistake made by the plaintiff, demanded that the plaintiff process unlawful orders, transferred half the units in her department without telling her, changed her supervisors four times within a few months, and gave her excessive and unnecessary assignments. *Id.* at 359–60. Here, no evidence of similarly aggravated conditions exists.

In *Martinez*, the plaintiff had anxiety and panic attacks about having to travel to Mexico for work. *Martinez v. Costco Wholesale Corp.*, 481 F. Supp. 3d 1076, 1084 (S.D. Cal. 2020). The plaintiff's supervisor forbade her from taking other work trips, which were necessary to succeed in her job, unless she traveled to Mexico. *Id.* at 1093. The supervisor also threatened to demote her to a lower-paying position or force her on an unpaid leave of absence if she did not travel to Mexico. *Id.* at 1093–94. The court found a triable issue as to whether this conduct constituted an adverse employment action. *Id.* The court also found a triable issue regarding whether constructive discharge occurred, relying in part on the fact that the employer threatened the plaintiff with "potential demotion" and "potential unpaid leave." *Id.* at 1097–98. Here, no evidence exists that Charter threatened to demote Plaintiff or force him on unpaid leave. Plaintiff requested medical leave while he looked for other positions, but he received short-term disability benefits during that time. And,

unlike in *Martinez*, Charter did not exclude Plaintiff from opportunities that were necessary to succeed at his job. To the extent the non-binding *Martinez* case holds that a failure to accommodate can contribute to a constructive termination, the Court declines to follow *Martinez* in light of *Brown*, *Doe*, and *Miller*. *Brown*, 275 Cal. Rptr. 3d at 332; *Doe*, 255 Cal. Rptr. 2d at 923; *Miller*, 325 Cal. Rptr. 3d at 746, 759; *see also Lopez v. Charter Commc'ns Inc.*, No. CV 19-00006-CJC(KKx), 2020 WL 2095797, at *8 (holding that failure to accommodate does not qualify as an adverse employment action).

The Court concludes that Plaintiff fails to "designate specific facts showing that there is a genuine issue for trial" regarding whether he suffered an adverse employment action. *Celotex*, 477 U.S. at 324.

ii. <u>Causation</u>

Even if Plaintiff had suffered an adverse employment action, he would still fail to establish a prima facie case of discrimination because he provides insufficient evidence of causation.

The FEHA prevents discrimination against an employee "because of" their disability. Cal. Gov't Code § 12940(a). Under the FEHA, "to discriminate" means "to treat differently." *Zamora*, 285 Cal. Rptr. 3d at 844 (citing *Wallace v. Cnty. of Stanislaus*, 199 Cal. Rptr. 3d 462, 473–74 (Cal. Ct. App. 2016)). "An employer has treated an employee differently because of a disability when the disability is a substantial motivating reason for the employer's decision to subject the employee to an adverse employment action." *Id.* (quotations and citation omitted). To negate the causation element at summary judgment, an employer must show that the employee cannot "demonstrate that [the employer] treated him differently from other employees because of his disability and that the disability was a substantial motivating reason for his disparate treatment." *Id.*

Here, no evidence exists that Charter treated Plaintiff differently than employees with similar performance metrics. Charter initially planned to require all employees to return to the office in phases, based on performance. (Jones Decl. ¶ 4.) The company eventually allowed some high performers to remain WFH, but no evidence exists that

Charter allowed employees with Plaintiff's scores to WFH. (Allen Dep. at 41:18–42:01, 49:21–24.) Although Jones testified that some "high risk" employees could return to the office in the later phases, she also stated that those employees could only continue to WFH indefinitely "if they were top performers." (Jones Dep. II at 79:07–14, 104:11–23.) The record does not contain evidence that Charter singled out Plaintiff in any way because of his disability or that his disability was a "substantial motivating reason" for his treatment. Accordingly, Plaintiff fails to establish causation.

Because Charter has successfully shown that Plaintiff cannot establish the adverse employment action and causation elements of his prima facie case of discrimination, the Court grants summary judgment to Charter on Plaintiff's disability discrimination claim. The Court does not reach the parties' arguments regarding pretext.

**C. Retaliation**

***1. Legal Standard***

Plaintiff's retaliation claim arises under the FEHA, which makes it illegal for employers to "to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part." Cal. Gov't Code § 12940(h). "To establish a prima facie case of retaliation under FEHA, an employee must show that (1) she engaged in a 'protected activity,' (2) the employer subjected her to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." *Bailey*, 552 P.3d at 450 (citing *Yanowitz*, 116 P.3d at 1130). The remaining steps of the *McDonnell Douglas* test also apply to FEHA retaliation claims. *Yanowitz*, 116 P.3d at 1130.

**2. McDonnell Douglas *Prima Facie Case of Retaliation***

The parties do not dispute that Plaintiff engaged in a protected activity by requesting a WFH accommodation. (ECF No. 37-1 at 23; *see also* Cal. Gov't Code § 12940(m)(2).) The remaining issues are whether Plaintiff suffered an adverse employment action and, if so, whether his WFH request caused the adverse action. As discussed, the Court finds that

Plaintiff fails to put forth sufficient evidence to survive summary judgment on the adverse employment action prong. Nor does Plaintiff provide evidence of a causal link between the protected activity and Charter's insistence that Plaintiff return to the office. Further, Plaintiff fails to raise any arguments specific to his retaliation claim in his briefing on the Motion for Summary Judgment. Accordingly, he fails to establish a prima facie case of retaliation and the Court grants summary judgment for Charter on Plaintiff's FEHA retaliation claim.

**D. Failure to Provide Reasonable Accommodation**

Charter contends that it is entitled to summary judgment on Plaintiff's failure to accommodate claim because (1) the company offered Plaintiff an alternative reasonable accommodation by granting his request for a leave of absence and (2) Plaintiff's requested WFH accommodation was unreasonable.

***1. Legal Standard***

The FEHA requires an employer to "make reasonable accommodation for the known physical or mental disability" of an employee, unless the accommodation produces "undue hardship" for the employer. Cal. Gov't Code § 12940(m)(1). "There are three elements to a failure to accommodate action: '(1) the plaintiff has a disability covered by the FEHA; (2) the plaintiff is a qualified individual (i.e., he or she can perform the essential functions of the position); and (3) the employer failed to reasonably accommodate the plaintiff's disability.'" *Hernandez v. Rancho Santiago Cmty. Coll. Dist.*, 232 Cal. Rptr. 3d 349, 353 (Cal. Ct. App. 2018).

To win summary judgment on a failure to accommodate claim, the employer must show that (1) "reasonable accommodation was offered and refused"; (2) no vacant position existed for which the employee was qualified, with or without accommodation; or (3) "the employer did everything in its power to find a reasonable accommodation, but the informal interactive process broke down because the employee failed to engage in discussions in good faith." *Miller*, 325 Cal. Rptr. 3d at 760 (quotations and citations omitted).

/ / /

### 2. *Qualified Individual*

Charter contends that Plaintiff's declining WFH performance demonstrated that he could not perform his essential job duties while WFH and thus was not a qualified individual entitled to a reasonable accommodation. (ECF No. 37-1 at 25.) Plaintiff disputes Charter's "conclusory" assertions of poor performance. (ECF No. 38 at 26.) He contends that he was qualified because he had received positive performance reviews for several years and Charter had not fired him. *Id.*

The "FEHA does not obligate the employer to accommodate the employee by excusing him or her from the performance of essential functions." *Nealy v. City of Santa Monica*, 184 Cal. Rptr. 3d 9, 21 (Cal. Ct. App. 2015) (citing *Lui v. City & Cnty. of San Francisco*, 150 Cal. Rptr. 3d 385, 393 (Cal. Ct. App. 2012)). To prevail on a failure to accommodate claim, "the plaintiff bears the burden of proving that he or she had the 'ability to perform the essential functions of a job with accommodation.'" *Lui*, 150 Cal. Rptr. 3d at 393 (quoting *Nadaf-Rahrov v. Neiman Marcus Grp., Inc.*, 83 Cal. Rptr. 3d 190, 213 (Cal. Ct. App. 2008)). The FEHA defines "essential functions" as the "fundamental job duties of the employment position the individual with a disability holds or desires." Cal. Gov't Code § 12926(f). Whether a particular function is essential may depend on the employer's judgment, written job descriptions, or the amount of time spent performing that function. *Id.* § 12926(f)(2). "The identification of essential job functions is a 'highly fact-specific inquiry.'" *Lui*, 150 Cal. Rptr. at 393 (quoting *Cripe v. City of San Jose*, 261 F.3d 877, 888 n.12 (9th Cir. 2001)).

The Court assesses whether Plaintiff could perform the essential functions of his job while WFH. The undisputed facts show that Plaintiff's job duties included "establish[ing] and maintain[ing] a high level of customer satisfaction, professionalism and courtesy." (ECF No. 37-1 at 117.) Further, Charter expects CSRs to engage customers with professionalism and meet performance metrics. (ECF No. 39-2 ¶¶ 10–12.) Before the pandemic, Plaintiff received satisfactory performance reviews with 3 out of 5 scores. (ECF No. 37-4 at 23–24; ECF No. 37-3 at 121, 128.) Charter submits the following evidence of

Plaintiff's purported poor performance while WFH: his 2021 Final Written Warning (ECF No. 37-3 at 136), his 2 out of 5 score in his 2021 performance review (*id.* at 132), his two verbal warnings in 2022 (*id.* at 140, 370), and his March 2022 PIP (*id.* at 369–75). The PIP stated that Plaintiff had fallen into the bottom 11% ranking for overall metrics of all CSRs. *Id.* at 370. Additionally, Jones testified that Plaintiff was "one of the worst performing agents." (Jones Dep. at 51:02–05.) Charter contends that this declining performance during the temporary WFH period proves that Plaintiff could not perform the essential functions of his position while WFH.

However, the record contains some ambiguity as to Plaintiff's WFH performance. Plaintiff received a 3 out of 5 score in his 2020 performance review, while WFH for part of the year.[4] (ECF No. 37-3 at 128.) In December of 2020, he received a 93.10% VOC rating and his supervisor told him: "You are amazing at your job and always open for constructive criticism . . . The effort you put forth every [] day doesn't go unseen . . . [T]hank you for all the hard work and dedication you've shown this year." *Id.* Although his performance scores dipped in 2021, Plaintiff received a "partially achieved expected performance" rating on his 2021 performance review. *Id.* at 132. His VOC rating, while below average, totaled 78.36%. *Id.* His performance on certain metrics exceeded expectations. *Id.* at 132–33. And his supervisor provided some positive feedback, telling Plaintiff: "You do have great knowledge of our system . . . and you do great passing that along to our teammate[s] and assisting in chat." *Id.* at 132. His supervisor also stated that Plaintiff was "dependable," "self-sufficient and self-motivated," and "always willing and ready to help [his] team go above and beyond." *Id.* at 133.

Although the evidence suggests that Plaintiff's performance declined in 2021 and 2022, he performed adequately in 2020—while WFH for some portion of the year.

---

[4] Charter contends that the 3 out of 5 score Plaintiff received in 2020 describes his "pre-WFH" performance. (ECF No. 37-1 at 10, 12.) However, Plaintiff began WFH at some point in 2020. (ECF No. 37-3 at 150–51.) His 2020 performance review thus reflects some period of WFH performance.

Additionally, Plaintiff's placement on a PIP does not necessarily indicate that he lacked the capacity for sufficient performance. Jones testified that, of the approximately 50 employees she supervised who received PIPs, only about two or three were terminated for failing to improve performance, and fewer than 10 resigned. (Jones Dep. II at 121:21–123:12.) The positive feedback from Plaintiff's supervisors and his satisfactory performance during some portion of the WFH period create a triable issue of fact as to whether Plaintiff could perform the essential functions of his job with a WFH accommodation.

At oral argument, the parties disputed whether doctor's notes proved that Plaintiff could not perform the essential functions of his job while WFH. To support his leave request, Plaintiff submitted a report that his psychiatrist completed on May 11, 2022. (ECF No. 37-3 at 157–65.) Plaintiff submitted a subsequent psychiatrist's note in support of his request to extend his leave by two months. *Id.* at 168–72. In both notes, in response to the question, "Will the patient be incapacitated for a single continuous period of time due to his/her medical condition, including any time for treatment and recovery?", the psychiatrist checked the box stating "yes." *Id.* at 161, 168. When asked to "estimate the beginning and ending dates for the period of incapacity," the psychiatrist estimated June 19, 2022 as the leave end date in the first note and extended it to August 14, 2022 in the second note. *Id.* In response to the question, "Has the patient recovered sufficiently to return to restricted work?", the psychiatrist checked the box stating "no." *Id.*

Charter contends that this proves Plaintiff's psychiatrist did not think Plaintiff had the capacity to WFH. (ECF No. 37-1 at 29.) However, the notes were submitted only after Charter repeatedly denied Plaintiff's requests to continue WFH and directed Plaintiff to either return to the office or request leave. Plaintiff's psychiatrist stated that Plaintiff was "able to communicate with clients from the safety of his home." (ECF No. 37-3 at 168.) The psychiatrist also stated that Plaintiff's "severe anxiety, panic attacks, asthma, and sleep apnea [we]re all exacerbated by returning to work with shared workspaces" and that Plaintiff "worried about exposure at work . . . and wearing a mask [was] worsening his

asthma." *Id.* at 161, 164. The Court finds that the psychiatrist's notes create triable issues of fact as to whether Plaintiff's psychiatrist believed he had the capacity to WFH or that WFH was a necessary accommodation.

Charter further contends that, although some CSRs can WFH, "in-person work was an essential job function for the lowest performers." (ECF No. 37-1 at 19.) Charter contends that because Plaintiff exhibited poor customer service, Plaintiff's managers needed to listen in on his calls, "provide on-the-spot feedback, [and] be able to jump in to assist at the raise of his hand"—all things that they could not do remotely. *Id.* at 19, 24.

The Court assesses whether working in person was an essential function of the job for low-performing CSRs. "'[A]n employer who disputes the plaintiff's claim that he can perform the essential functions must put forth evidence establishing those functions.'" *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974 (9th Cir. 2007) (en banc) (quoting *EEOC v. Wal-Mart*, 477 F.3d 561, 568 (8th Cir. 2007)), *abrogation on other grounds recognized by Healy v. Milliman, Inc.*, 164 F.4th 701, 708 (9th Cir. 2026). Jones testified that supervisors can more easily monitor low-performing CSRs in person than remotely. (Jones Dep. at 111:2–112:11.) She stated that, when CSRs work remotely, "they're trying to reach out via chat" and "it's very difficult to get someone to respond immediately." *Id.* at 112:14–17. But when CSRs work in person, she stated, they can "simpl[y] rais[e]" their hands and a supervisor can walk over and provide them with immediate, "on-the-spot coaching right there and then . . . [s]itting even side by side, if needed." *Id.* at 112:17–24. She also testified that "it's difficult" for supervisors to check their "chat" for remote employees who need help when those supervisors are also on calls themselves. (Jones Dep. II at 113:10–12.) However, she later stated that supervisors "can check the chats" while they are on calls and that they "should be checking [their] chats." *Id.* at 114:05–07.

Allen stated that nothing is different about the way he supervises employees based on whether they are WFH or in person. (Allen Dep. at 76:04–07.) Allen testified that he never told anyone that Plaintiff "could not adequately perform his job if he was remote." (Allen Dep. II at 74:21–75:07.) He further testified that his main task is "listening to

[CSRs'] phone calls" and that he can do this "regardless of whether they are remote or in person." *Id.* at 75:14–76:03. The conflicting evidence about the ability to supervise CSRs who work remotely presents a genuine dispute of material fact as to whether working in person is an essential job function for low-performing CSRs. *See Rezvan v. Philips Elecs. N. Am. Corp.*, No. 15-cv-04767-HSG, 2016 WL 8193160, at *3 (N.D. Cal. Dec. 15, 2016) (finding a triable issue as to whether onsite attendance was an essential function where employer allowed other employees in plaintiff's position to WFH and plaintiff's supervisor said the key job duties "could be executed remotely").

### 3. *Reasonableness of WFH Accommodation*

Charter contends that Plaintiff cannot base his failure to accommodate claim on the denial of a WFH accommodation because the requested WFH accommodation was unreasonable. (ECF No. 37-1 at 26.) "Reasonable accommodation" under the FEHA means "a modification or adjustment to the workplace that enables the employee to perform the essential functions of the job." *Nadaf-Rahrov*, 83 Cal. Rptr. 3d at 211. Reasonable accommodations may include "[j]ob restructuring, part-time or modified work schedules, . . . and other similar accommodations for individuals with disabilities." Cal. Gov't Code § 12926(p)(2). "The employer is not obligated to choose the best accommodation or the accommodation the employee seeks." *Hanson v. Lucky Stores, Inc.*, 87 Cal. Rptr. 2d 487, 495 (Cal. Ct. App. 1999) (citing *Soldinger v. Nw. Airlines, Inc.*, 58 Cal. Rptr. 2d 747, 762 (Cal. Ct. App. 1996)). "Ordinarily, the reasonableness of an accommodation is an issue for the jury." *Kaur v. Foster Poultry Farms LLC*, 299 Cal. Rptr. 3d 433, 452 (Cal. Ct. App. 2022) (quotations and citations omitted).

Charter contends that Plaintiff's request to WFH until COVID-19's eradication was "per se unreasonable" because it had "no foreseeable end date." (ECF No. 37-1 at 26.) However, binding Ninth Circuit precedent from decades before the pandemic began recognized WFH as a reasonable accommodation under some circumstances. *See Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1136 (9th Cir. 2001) ("Working at home is a reasonable accommodation when the essential functions of the position can be

performed at home and a work-at-home arrangement would not cause undue hardship for the employer.”). California regulations list WFH as an example of a reasonable accommodation. Cal. Code Regs. tit. 2, § 11065(p)(2)(L). And Charter still allows several employees in Plaintiff’s position to WFH, years after the pandemic ended. (Allen Dep. at 29:20–24, 31:03–09, 41:18–42:01, 49:21–24.) Even if all employees who currently WFH are higher performers than Plaintiff, that fact would not render Plaintiff’s request for a WFH accommodation per se unreasonable because, as discussed, a triable issue of fact exists as to whether low performing CSRs require in-person supervision. The Court concludes that a triable issue exists regarding whether WFH was a reasonable accommodation under these facts.

***4. Reasonableness of Leave Accommodation***

Even if WFH was a reasonable accommodation, Charter contends, Plaintiff cannot succeed on his failure to accommodate claim because Charter reasonably accommodated him with a leave of absence. (ECF No. 37-1 at 25; ECF No. 39 at 12.) Charter contends that leave was a reasonable accommodation because (1) “its purpose was to allow Plaintiff time to become comfortable with returning to a shared workspace and to perform his essential job duties” and (2) Plaintiff did not communicate with his supervisors after he went on leave. (ECF No. 39 at 11.)

Leave of absence can constitute a reasonable accommodation when it is finite and will enable the employee to return to work when it expires. Leave “may be a reasonable accommodation *provided that the leave is likely to be effective in allowing the employee to return to work at the end of the leave*, with or without further reasonable accommodation . . . When an employee can work with a reasonable accommodation other than a leave of absence, an employer may not require that the employee take a leave of absence.” Cal. Code Regs. tit. 2, § 11068(c) (emphasis added); *see also Hanson*, 87 Cal. Rptr. 2d at 494 (“[A] finite leave [of absence] can be a reasonable accommodation under [the] FEHA, provided it is likely that at the end of the leave, the employee would be able to perform his or her duties.”). “‘Reasonable accommodation does not require the employer

to wait indefinitely for an employee's medical condition to be corrected." *Hanson*, 87 Cal. Rptr. 2d at 494 (quoting *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1047 (6th Cir. 1998)).

Courts have deemed leave a reasonable accommodation where an employee had temporary work restrictions and the leave period would allow the employee to recover and return to work. *See Miller*, 325 Cal. Rptr. 3d at 761 (holding that leave was a reasonable accommodation "during the period in which plaintiff was subject only to temporary work restrictions for her physical injury"); *cf. Hanson*, 87 Cal. Rptr. 2d at 494 (finding leave a reasonable accommodation for a hand injury where there was "no showing that at the time he began his leave, [the employee's] prognosis for recovery was not good").

However, leave may not be a reasonable accommodation where an employee has permanent restrictions and likely will not be able to return to work after the leave expires. *See, e.g.*, *Estrada v. Kag West, LLC*, No. 1:24-CV-00257-KES-CDB, 2025 WL 1939400, at *9 (E.D. Cal. July 15, 2025) (denying summary judgment on failure to accommodate claim where plaintiff received leave accommodation after his work restrictions became permanent). *Shirvanyan v. Los Angeles Community College District* illustrates this distinction. 273 Cal. Rptr. 3d 312 (Cal. Ct. App. 2020). In *Shirvanyan*, the California Court of Appeal reached different conclusions about the reasonableness of a leave accommodation for a temporary wrist injury and a permanent shoulder injury. *Id.* at 325–29. The plaintiff's doctors testified that she would need approximately two months to recover from her wrist injury and "go back to her customary work." *Id.* at 326. The court found that "finite medical leave was an available reasonable accommodation" for the wrist injury because it would allow her to perform her duties at the end of the leave period. *Id.* However, the plaintiff's doctors recognized that her shoulder injury was much more severe and did not specify when, if at all, the plaintiff's shoulder would recover enough for her to return to work. *Id.* at 326–27. The court concluded that finite leave was not a reasonable accommodation for the shoulder injury because it was not likely that the plaintiff could perform her normal duties after the leave concluded. *Id.*

Here, Plaintiff asserted that he had asthma and sleep apnea, which made him "high risk" for COVID-19 complications. (Allen Dep. at 56:02–16; Plaintiff Dep. at 168:10–19.) He also claimed that he suffered anxiety and panic attacks that increased when he wore masks, which also exacerbated his asthma. (ECF No. 37-3 at 157.) Plaintiff's psychiatrist described his treatment plan as "medication management with monthly appointments to ensure stability and monitor progress." *Id.* The psychiatrist initially stated that Plaintiff's "period of incapacity" would last until June 19, 2022 but later extended that date to August 14, 2022. *Id.* at 161, 168. Unlike the wrist injury in *Shirvanyan*, there is at least an issue of fact as to whether asthma, anxiety, and panic disorder are conditions with indeterminate recovery timelines, and thus less suited for finite leave. Further, the psychiatrist stated that Plaintiff had "suffered from anxiety, depression, and panic attacks since his teenage years." *Id.* at 166. Neither party has submitted sufficient evidence that a moderate "medication management" plan could remedy Plaintiff's asserted mental health issues in just a few months, especially given the unique situation presented by COVID-19. Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that it was not "likely that following the leave [Plaintiff] would be able to perform [his] duties." *Hanson*, 87 Cal. Rptr. 2d at 494 (citations omitted). Accordingly, a triable issue exists regarding whether Plaintiff's leave of absence constituted a reasonable accommodation that would defeat his § 12940(m) claim.

The Court denies the Motion for Summary Judgment as to Plaintiff's failure to accommodate claim because genuine disputes of material fact exist regarding whether (1) Plaintiff could perform the essential functions of his job, (2) his requested WFH accommodation was reasonable, and (3) the leave accommodation was reasonable.

**E. Failure to Engage in the Interactive Process**

***1. Legal Standard***

The FEHA requires an employer to "engage in a timely, good faith, interactive process with the employee or applicant to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee or applicant

with a known physical or mental disability or known medical condition." Cal. Gov't Code. § 12940(n). "The 'interactive process' required by the FEHA is an informal process . . . to attempt to identify a reasonable accommodation that will enable the employee to perform the job effectively. Ritualized discussions are not necessarily required." *Wilson v. Cnty. of Orange*, 87 Cal. Rptr. 3d 439, 447 (Cal. Ct. App. 2009) (citations omitted). When an employee's disability and limitations are not obvious, the employee bears the initial burden "to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations." *Scotch*, 93 Cal. Rpt r. 3d at 360–61 (quotations and citation omitted). "Although it is the employee's burden to initiate the process, no magic words are necessary." *Gelfo v. Lockheed Martin Corp.*, 43 Cal. Rptr. 3d 874, 896 n.22 (Cal. Ct. App. 2006). Once the employer "becomes aware of the need to consider an accommodation," it has a continuous obligation "to engage in the [interactive] process in good faith." *Scotch*, 93 Cal. Rptr. 3d at 361 (citations omitted).

"The purpose of the interactive process is to determine what accommodation[] is required." *Brown*, 275 Cal. Rptr. 3d at 334. Accordingly, "an 'employer cannot be held liable for failing to engage in the interactive process when the employee was in fact offered a reasonable accommodation.'" *Miller*, 325 Cal. Rptr. 3d at 764 (quoting *Wilson*, 87 Cal. Rptr. 3d at 447). "Likewise, an employer cannot be held liable for failure to engage in the interactive process where the employee is unable to identify a reasonable accommodation that would have been available had the parties engaged in the interactive process." *Id.* (citations omitted).

The *Miller* court identified two ways for an employer to win summary judgment on an interactive process claim: an employer can show either "(1) that a reasonable accommodation was, in fact, offered in response to a known disability or (2) that no reasonable accommodation was available even if the parties had engaged in the interactive process with respect to a known disability." *Id.*

/ / /

/ / /

***2. Discussion***

With respect to the first *Miller* prong, Charter contends that it offered Plaintiff a reasonable accommodation: a leave of absence. (ECF No. 37-1 at 27.) As discussed, a genuine issue of material fact exists regarding whether leave was a reasonable accommodation.

With respect to the second *Miller* prong, Charter raises several arguments contending that no objectively reasonable accommodation existed, besides leave. (ECF No. 37-1 at 28.) First, Charter contends that Plaintiff's requested WFH accommodation was unreasonable because Plaintiff could not perform effectively while WFH. *Id.* at 28–29. As discussed, the Court finds a triable issue regarding whether Plaintiff could perform the essential functions of his job while WFH. Second, Charter contends that no medical basis existed for a WFH accommodation because Plaintiff's medical documentation did not support his WFH request. *Id.* at 29. However, as discussed, the psychiatrist's note submitted in support of Plaintiff's leave extension request stated that Plaintiff's panic attacks made it "near impossible for [him] to leave his home," but he was "able to communicate with clients from the safety of his home." (ECF No. 37-3 at 168.) The Court concludes that a genuine issue of material fact exists as to whether a medical basis existed for a WFH accommodation. Third, Charter contends that engaging in an interactive process would have been futile because "Plaintiff was unwilling to consider any accommodation other than permanent WFH." *Id.* (ECF No. 37-1 at 29.) This argument assumes that a WFH accommodation was unreasonable. However, a reasonable jury could find that WFH was a reasonable accommodation.

Accordingly, the Court denies the Motion for Summary Judgment as to Plaintiff's claim for failure to engage in the interactive process.

/ / /

/ / /

/ / /

/ / /

### F. Derivative Claims

Charter seeks summary judgment on Plaintiff's derivative claims: failure to prevent discrimination and retaliation under the FEHA, declaratory judgment, and wrongful constructive termination in violation of public policy. The FEHA makes it unlawful for an employer to "fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring." Cal. Gov't Code § 12940(k). "An actionable claim under [§ 12940(k)] is dependent on a claim of actual discrimination: 'employers should not be held liable to employees for failure to take necessary steps to prevent such conduct, except where the actions took place and were not prevented.'" *Scotch*, 93 Cal. Rptr. 3d at 367 (quoting *Trujillo v. N. Cnty. Transit Dist.*, 73 Cal. Rptr. 2d 596, 602 (Cal. Ct. App. 1998)). The Court grants summary judgment for Charter on Plaintiff's § 12940(k) claim for failure to prevent discrimination and retaliation because Plaintiff lacks viable underlying claims for discrimination and retaliation. The Court also grants summary judgment on Plaintiff's wrongful constructive termination and declaratory judgment claims because those claims depend on the existence of an adverse employment action, which Plaintiff fails to establish. *See Hanson*, 87 Cal. Rptr. 2d at 496–97.

## V. CONCLUSION

IT IS HEREBY ORDERED that the Motion for Summary Judgment (ECF No. 37) is denied as to the failure to accommodate claim and failure to engage in the interactive process claim, and granted as to all other claims.

IT IS FURTHER ORDERED that the Court sets the following deadlines: (1) counsel shall comply with the pre-trial disclosure requirements of Federal Rule of Civil Procedure 26(a)(3) by September 30, 2026; (2) counsel shall meet and take the action required by Civil Local Rule 16.1.f.4 by October 7, 2026; (3) Plaintiff's counsel shall provide opposing counsel with the proposed pretrial order by October 14, 2026; (4) the parties shall lodge the proposed pretrial order with the Court, including any objections to the other party's respective pretrial disclosures, by **October 28, 2026**; and (5) the final Pretrial Conference is scheduled on **November 4, 2026 at 10:30 AM** before the Honorable William Q. Hayes

in Courtroom 15B. In meeting these deadlines, the parties shall otherwise adhere to the relevant instructions contained in the prior Scheduling Order (ECF No. 24).

Dated: August 31, 2026

William Q. Hayes
Hon. William Q. Hayes
United States District Court